ROODENKO v. UNITED STATES.

ROCKWELL v. SAME.

HUTCHINSON v. SAME.

WHITE v. SAME.

Nos. 2968–2971.

Circuit Court of Appeals, Tenth Circuit.

Dec. 22, 1944.

Rehearing Denied Jan. 9, 1945.

Second Petition for Rehearing Denied
April 7, 1945.

Writ of Certiorari Denied March 26, 1945.

See 65 S.Ct. 867.

Affirmed.

Carle Whitehead, of Denver, Colo. (Arthur A. Brooks, Jr., of Denver, Colo., on the brief), for appellant Igal Roodenko.

Joseph E. Newman, Asst. U. S. Atty., of Denver, Colo. (Thomas J. Morrissey, U. S. Atty., of Denver, Colo., on the brief), for appellees.

Before PHILLIPS, BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

This is a consolidated appeal of four cases, No. 2968, Igal Roodenko v. United States, No. 2969, Donald West Rockwell v. United States, No. 2970, James Glenn Hutchinson v. United States, and No. 2971, Everett A. White v. United States. Briefs have been filed only in No. 2968. The questions in the four cases are identical, and it is agreed that the decisions in the other three cases shall be the same as in the Roodenko case. Appellant will be referred to either as appellant or Roodenko.

Appellant is conscientiously opposed to participation in war in any form. He was classified as IV-E. When he was called up for service, he claimed his exemption and was assigned to work of national importance by the Director of Selective Service. At the time of his conviction, he was located at Camp No. 111, in Montezuma County, Colorado. He was convicted of refusing to work and perform the duties assigned to him by the Director of Civilian Public Service Camp No. 111. The facts are not in dispute.

The appeal challenges the constitutionality of that part of Section 5(g) of the Selective Training and Service Act of 1940 [1] which relates to those who by reason of religious training and belief are opposed to participation in war in any form. It is claimed that this portion of the Act is unconstitutional because (1) it deprives such persons as are covered thereby of the free exercise of religion, contrary to the First Amendment to the United States Constitution; (2) it deprives them of liberty and property without due process of law, and takes their private property without just compensation, contrary to the Fifth Amendment; and (3) it subjects them to involuntary servitude not as punishment for crime, contrary to the Thirteenth Amendment.

It is further urged that Executive Order No. 8675 of February 6, 1941, Selective Service System Order No. 111, Mancos Project, Colorado, and Selective Service System Regulations, Part 692—Rules for Government Operated Camps, are void because: (a) They are in excess of any power which Congress had to delegate and are in excess of the power delegated by the Act; (b) the order, rules and regulations violate the United States Constitution; and (c) they subject assignees to such camps to military direction in violation of the Act.

 There is no constitutional right of exemption from service in our armed forces on account of religious training or conscientious scruples against participation in war, or for any other reason.[2] This principle is too well settled to need any extended discussion or the citation of a great

[1] 50 U.S.C.A.Appendix § 305(g) herein referred to as the Act.

[2] United States v. McIntosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302; Selective Draft Law Cases (Arver v. United States), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas. 1918B, 856.

number of cases. There are none holding to the contrary.

While Assignment No. 1 asserts a constitutional right of exemption from military service, Roodenko apparently does not make this asserted ground the basis of his appeal. He states in his brief that "So far as this case is concerned, it may be admitted that appellant had no constitutional exemption and that, had Congress seen fit so to do, it might have refused any exemption whatsoever on the ground of conscience or religious objection." He then argues that the Act of 1940 was limited in its scope to raising and training armed forces, and that it does not purport to be an exercise of the general war powers of Congress. The argument is made that when Congress limited the Act to raising and training soldiers and sailors for our armed services and thereunder granted appellant an exemption from such service, Congress could not make that exemption conditional by requiring appellant to render service in works of national importance in civilian public service camps. We cannot agree that the Act is, or was intended by Congress to be, so narrowly limited in its operation. In 1940, when this Act was before Congress, the world was aflame. War was all about us. All charged with the safety of our country felt that there was great danger that the scourge of war would not pass us by. Under these conditions Congress recognized the existence of a grave emergency. The Act itself declares the existence of such an emergency which made necessary the passage of this legislation. Congress had in mind more than the limited objective appellant would ascribe to it in the passage of this Act. It sought to completely and adequately prepare our country for defense by marshaling the man-power of the nation and by raising, equipping, and supporting armies for the defense of our land. This is the interpretation which the Supreme Court has placed upon the scope and purpose of this Act.[3]

It is not correct to say that appellant and those who believe as he does are ex-empt from the operation of the Act. They are subject to draft the same as one who has no scruples against serving his country in the armed forces, the only difference being that under the provisions of the Act they are excused from military service. The Act specifically provides that they may be drafted or "called up," if one prefers that term, to serve their country in work considered of national importance under civilian direction.

If Congress, as we have held, has the power to compel conscientious objectors to serve in the military forces, they cannot be heard to complain that they are relieved from such service on condition that they nevertheless recognize their obligation of citizenship and respond to call and serve their country in non-military work of national importance, under civilian authority. Congress could have required Roodenko to serve in the armed forces. Having no constitutional right of exemption from such service, he certainly can have no constitutional grounds to challenge the validity of an Act which gives him a conditional exemption from a service which he could be compelled to perform.

The conclusion we have reached in regard to Assignment of Error No. 1 disposes of Assignments 2 and 3. They fall of their own weight. It follows that Roodenko is not deprived of any constitutional rights by being compelled to perform a service which may be lawfully exacted any more than a soldier is deprived of similar rights by being required to offer his life on the field of battle.

The contention that the Act does not authorize the President to set up civilian public service camps for conscientious objectors is without merit. The Act specifically provides that they shall be assigned to work of national importance under civilian direction. This contemplates an organization perfected for this purpose. It was not necessary for the Act to define in detail the organization which was to be created. It was sufficient to designate the framework within which it

---

[3] In Falbo v. United States, 320 U.S. 549, 551, 64 S.Ct. 346, 347, the Supreme Court said: "When the Selective Service and Training Act was passed in September, 1940, most of the world was at war. The preamble of the Act declared it 'imperative to increase and train the personnel of the armed forces of the United States.' The danger of attack by our present enemies, if not imminent, was real, as subsequent events have grimly demonstrated. The Congress was faced with the urgent necessity of integrating all the nation's people and forces for national defense. * * * Accordingly the Act was passed to mobilize national manpower with the speed which that necessity and understanding required."

was to be confined. This it did when it designated a civilian organization devoted to work of national purposes.

Section 310(a) (1) of the Act (50 U.S.C.A.Appendix) directs the President to make all necessary rules and regulations to carry out the Act. This includes the provision for an organization to which conscientious objectors are to be assigned. The yardstick is laid down in the Act. It remains only to consider whether the President remained within it.

By Executive Order 8675 the President directed the Director of Selective Service to set up these organizations within the framework of the Act, and directed him to adopt necessary rules and regulations for the same. It further directed that he should determine the agencies that should provide the civilian control and that he should have general supervision and control over such work. Pursuant to this authority, by Order 111, the Director declared the Colorado project to which Roodenko was assigned to be a work of national importance. The project was a water storage and irrigation project. It was placed under the technical direction of the Bureau of Reclamation of the Department of the Interior. The Bureau of Reclamation was made responsible for the housing, feeding, clothing, discipline and health of those assigned to it. Supervision of the project was under the Selective Service System through the Camp Operations Division of the National Selective Service Headquarters.

From this brief analysis of the orders creating this agency, it is apparent that they contemplate civilian control. The particular project was placed under the control of a branch of the Department of the Interior. There are presently one hundred eight of these projects in operation, with 7,601 conscientious objectors assigned to them. Of these, one hundred five are sponsored and operated by private religious organizations, such as Brethren Service Committee, Mennonite Central Committee, Association of Catholic Conscientious Objectors, and others. Only three are sponsored directly by the government without the aid of religious groups. All of them are governed by the same rules and regulations set up pursuant to Executive Order 8675.

It is argued that the military character of these establishments is shown by the fact that the Act itself makes the Chief of Finance of the United States Army the fiscal disbursing and accounting agent of the Director of Selective Service, that the head of the Selective Service System is a Major General in the Army, and that the head of the Camp Operations Division is an Army Colonel and signs his directives as "Colonel, Field Artillery." The fact that the organization is headed by an Army officer does not make it a part of the Army. There are innumerable instances where Army or Navy officers have been assigned to civilian work. In Southern Pac. Co. v. United States, 285 U.S. 240, 52 S.Ct. 324, 76 L.Ed. 736, it was held that Army officers who were assigned to rivers and harbors work were engaged in non-military work. Neither the Army nor the Navy has any control over these assignees. They are not subject to court-martial or punishment by the Army or Navy for infractions of any of the rules of the organization or for the commission of any offense against either the laws of the state in which they are located or against the laws of the nation. For all such offenses they are subject to prosecution in the civil courts and not in the military courts. They may not be court-martialed or disciplined by the Army because they are not subject to nor a part of the armed services.

And, finally, it is contended that Order No. 111, setting up this project, is void because the project is not of national importance. It is contended that it is a local reclamation water storage and irrigation project of no national importance having no connection with the war effort. The proper maintenance of agriculture, civilian business, transportation, sanitation, health, and many other civilian activities are as essential to the successful prosecution of the war and as much a part of the war effort as the production of munitions of war and the arming and equipping of the military forces. The Act places the determination of what projects are of national importance with the President. Roodenko has no standing to challenge the exercise of this discretion by the President.

Other incidental questions are raised, such as the one attacking the rules and regulations governing the conduct of the assignees to the project in question. They are not of sufficient importance to justify a detailed discussion thereof. Suffice it to say that we have given them careful con-

sideration and find them without merit. It is our conclusion that neither the Act, Executive Order No. 8675, Selective Service System Order No. 111, nor the rules and regulations governing the camp violate any of Roodenko's constitutional rights or immunities.

The judgments in No. 2968, Roodenko v. United States, No. 2969, Rockwell v. United States, No. 2970, Hutchinson v. United States, and No. 2971, White v. United States, are severally affirmed.