SYLVESTER J. LYNCH, PLAINTIFF-RESPONDENT, v. BOR-
OUGH OF EDGEWATER, DEFENDANT-APPELLANT.

Argued November 26, 1951—Decided December 17, 1951

*Mr. Milton L. Lasher* argued the cause for the appellant.

*Mr. Abram A. Lebson* argued the cause for the respondent (*Mr. Stanley W. Bradley*, of counsel).

The opinion of the court was delivered by

BURLING, J.   The defendant, Borough of Edgewater, appeals from a judgment of the Superior Court, Appellate Division, entered June 25, 1951, reversing a judgment of dismissal entered in its favor and against the plaintiff, Sylvester J. Lynch, in the Bergen County District Court in

a civil action for salary brought under *R. S.* 38:23–1. The defendant appealed on constitutional grounds. *Rule* 1:2–1(*a*).

The facts upon which this action is predicated are not complex. The plaintiff, engaged in public employment as a patrolman of the police department of the defendant, is and has been for many years a member of the Organized Reserve of the Army of the United States, in more recent years holding the rank of major. In 1948 he was attached to the 192nd Organized Reserve Composite Group (of the Army of the United States) at Kearney and Newark, New Jersey. In July, 1948, the plaintiff voluntarily applied for active duty training with the United States Army, and upon acceptance of that application he was ordered to duty to attend the Associate Basic Course at the Transportation School, Fort Eustis, Virginia, for a period of 90 days effective September 17, 1948, to December 15, 1948. On September 16, 1948, plaintiff applied in writing to the mayor and council of the defendant for leave of absence from his duties as patrolman for a period of 90 days beginning September 16, 1948, "for the purpose of doing active duty in connection with the United States Army." This application contained no request for pay, and was granted without pay at a meeting of the mayor and council held on October 5, 1948. Plaintiff's orders to active duty were individual and authorized his attendance at a service school in his individual capacity. Although his application was processed through the unit instructor of his organized reserve group, there is no indication in the record that the group was ordered to training duty as a collective unit. The plaintiff testified that the course he attended was an officers' training course attended by other officers from all over the United States, and admitted that as far as he was concerned it was individual and specialized training, a basic training course of general interest to himself; he testified that he was "schooling myself to Staff Level." The plaintiff without objection testified as to the text of Army Special Regulations 140–220– C3, relative to

Organized Reserve Corps, Short Tours of Active Duty Training, which classifies active duty training in several categories including as one class "field exercises" and another class as "attendance as students at service schools," and testified (also without objection) that the Army does not use the specific term "field training." He admitted however that he had applied for active duty in the Army and for leave from his duties as patrolman of the defendant, to attend the Fort Eustis Transportation School as a student. He further testified (again without objection) that the Army designation "Active Duty Training" in general includes "all phases of military activity, such as field training, assembly with troops, lectures, conferences—well, everything that would enable you to be effective when your country is at arms."

After his return from his tour of active duty as a student at the transportation school at Fort Eustis, the plaintiff demanded of the defendant payment of his salary as a patrolman for the period covered by his leave of absence. His demand was refused and he instituted this civil action against the defendant in the Bergen County District Court to recover that pay. Judgment for the defendant was entered on the ground that as a matter of law plaintiff was not engaged in field training under R. S. 38:23–1, upon which statute he had based his claim for recovery. Upon appeal to the Superior Court, Appellate Division, the judgment was reversed and a new trial was ordered. The defendant thereupon filed this appeal, contending as its basis for appeal that the statute as construed by the Superior Court, Appellate Division, was unconstitutional.

The statute thus brought before us is R. S. 38:23–1, which reads as follows:

"38:23–1. Leave of absence for field training in reserve corps of United States.

An officer or employee of the state or a county or municipality, who is a member of the organized reserve of the army of the United States, United States naval reserve force and United States marines corps reserve, or other organization affiliated therewith, shall be entitled to leave of absence from his respective duty without loss of

pay or time on all days on which he shall be engaged in field training. Such leave of absence shall be in addition to the regular vacation allowed such employee."

The Superior Court, Appellate Division, in effect, construed the foregoing statute as including attendance at service schools in the meaning of "field training" and held the statute constitutional. The validity of the judgment of the Appellate Division is questioned on the appeal to this court on the same grounds. We shall consider these questions in the same order.

*Construction of R. S. 38:23–1:*

It is contended by the defendant that the military duty performed by the plaintiff during his leave of absence did not constitute "field training" within the purview of *R. S.* 38:23–1, *supra.* The plaintiff contends that this argument may not be advanced on this appeal because certification was not sought by defendant and granted by this court in that connection. The plaintiff's contention in this regard is without merit. Compare *Frank v. Frank, 7 N. J.* 225, 234–235 (1951).

■■ On the merits of this question we agree with the defendant, and accordingly we hold that *R. S.* 38:23–1, *supra,* must be construed to intend by "field training" only that training which consists of participation in unit training in field operations. The specification of who shall benefit and *under what conditions* is a legislative function and we should not construe statutes any more broadly nor give them any greater effect than their language requires. *Adams v. Atlantic City,* 137 *N. J. L.* 648, 652 (*E. & A.* 1948). The military definition of "field" is "a place where a battle is fought," and of "field training" is the "theoretical and practical training of *troops* for service against an enemy." (Emphasis supplied.) *Webster's New International Dictionary* (1947), at *pp.* 940, 942. "Troops" means "soldiers collectively; an armed force." *Id.,* at *p.* 2720. And the word "troops" as used in statutes has been so construed. *Southern Pac. Co. v.*

*U. S., 285 U. S. 240, 76 L. Ed. 736* (1932) ; *United States v. Union Pac. R. Co., 249 U. S. 354, 63 L. Ed.* 643 (1919).

We would be remiss if we were not to demonstrate the fact that our interpretation of this statute (*R. S.* 38:23–1) is declarative of the legislative intent. The inquiry in a matter of statutory construction is to make such a determination, and in so doing it is necessary to ascertain the old law, the mischief therein and the remedy proposed in the legislation under consideration. *Grobart v. Grobart, 5 N. J.* 161, 166 (1950) ; *Blackman v. Iles, 4 N. J.* 82, 89 (1950). In addition in the present case we are under a constitutional mandate to construe the statute in question, which concerns municipal corporations, liberally *in favor of those municipal corporations, N. J. Const.* 1947, *Art. IV, Sec. VII, par.* 11. Liberal construction does not connote an extension of the boundaries delineated by the terms as commonly used, unless the context of legislative expression clearly discloses a special usage. *Alex. Hamilton Hotel Corp. v. Board of Review,* 127 *N. J. L.* 184, 187 (*Sup. Ct.* 1941). Departure from the literal import of the terms employed by the Legislature to declare its intent is warranted only to effectuate that intention which is evident from a view of the whole law and other laws *in pari materia. Singer Sewing, &c., Co. v. N. J. Unemployment, &c.,* 128 *N. J. L.* 611, 616, 617 (*Sup. Ct.* 1942), affirmed *per curiam* 130 *N. J. L.* 173 (*E. & A.* 1943). Statutes *in pari materia* are construed together so as to effectuate general legislative policy; every word must be given full force and effect if possible; *Jersey City v. Dept. of Civil Service, 7 N. J.* 509, 522 (1951). And the true meaning of any word, clause or provision of a statute is that which best comports with the subject and general object of the statute. *Central R. R. Co. of N. J. v. Division of Tax Appeals, 8 N. J.* 15, 28 (1951).

The statute here in question, *R. S.* 38:23–1, was enacted as *L.* 1931, *c.* 347, *secs.* 1 and 2. It provides in effect that any member of the military or naval reserves of the United States *shall* be entitled to leave without loss of pay, in addi-

tion to regular vacation, on all days on which he shall be engaged in field training. Prior to this enactment, there existed a statute (which is still in effect), *L.* 1918, *c.* 16, *sec.* 1, now *R. S.* 38:23–3, which granted discretionary authority to a municipality to pay in whole or in part the salaries or compensation of its employees "during the time they are engaged in a branch of the military or naval service of the national government or of this state" provided that no greater portion of the salary or compensation of a commissioned officer "shall be paid to him" under this section than will when added to his salary as such commissioned officer equal the amount paid to him by the municipality before he entered the military or naval service. It is readily to be seen that the 1918 statute applied to all types of military or naval service and provided only permissive payment of civilian compensation and limited reserve commissioned officers to the receipt of such part of their civilian compensation as constituted the difference between their civilian pay (if greater than the military) and their military pay. There also was in existence at the time of the enactment of *L.* 1931, *c.* 347 (now *R. S.* 38:23–1), *supra,* another statute, namely *L.* 1918, *c.* 151, *secs.* 1 *and* 2, now *R. S.* 40:46–11. This law provided that every officer or employee not holding his office for a fixed term or period, upon entering the military or naval service of the United States "shall be granted leave of absence until such time as he shall be honorably discharged from such service  *  *  *  with or without pay as provided by law." An examination of the 1918 legislation, *ante,* shows that whether a reserve officer was ordered to training duty without his consent or voluntarily applied therefor, the payment of civilian compensation to him was discretionary. Under 39 *Stat.* 189, *sec.* 37a (1916), as amended 41 *Stat.* 776 (1920), 10 *U. S. C. A., sec.* 369, a congressional enactment that has been in effect since 1920, the President may order reserve officers to active duty at any time, other than during the existence of a national emergency expressly declared by Congress, for no more than 15 days in any calendar

year without his express consent. This is an indication of the apparent desire of the Legislature in enacting the 1931 statute, now undergoing examination by us, namely to provide encouragement for public employees to maintain active reserve commissions by providing that their compensation should continue in full while they were on field training duty with the armed forces of the United States. The point next to be demonstrated is the *extent* to which the Legislature designed its expression to operate. The statute shows no confinement to a period of days or months; the only limitation enacted is that the military or naval service be that involved in "field training"; as we have illustrated, this term has a definite military meaning, and the only further question presented therefore is whether the Legislature intended it so to be applied. The statutory expressions in that connection relate primarily to national guard activities, but clearly indicate the common legislative understanding of the term "field training." For instance *R. S.* 38:6–3 (*L.* 1932, *c.* 148, *sec.* 1) recognizes a distinction between "armory drill" and "field training"; *R. S.* 38:3–38 (*L.* 1937, *c.* 49, *art.* 9, *sec.* 2) provides that members of the inactive National Guard "may be required to attend field training" but provides for no other compulsory military service; *R. S.* 38:12–4 (*L.* 1937, *c.* 49, *art.* 13, *sec.* 4) relating to National Guard, Naval Militia and New Jersey Guard, provides for the granting of leave of absence without loss of pay to state and municipal employees who are members of those services while "engaged in field training *or other duty ordered by the governor*" (emphasis supplied), clearly indicative of a legislative understanding of the difference between field training and other military or naval duty, and *R. S.* 38:12–5 provides for such compensation to be paid to such persons, while on active service with the Army or Navy of the United States or any other organization affiliated therewith, as will equal the loss otherwise suffered by reason of such active service, indicating a distinction between the field training (or other duty ordered by the Governor) designation of *R. S.* 38:12–4, *supra,* and

other active service. The congressional enactments likewise clearly indicate a distinction between field training and other forms of service. See for example 40 *Stat.* 72 (1917), as amended 61 *Stat.* 238 (1947), 10 *U. S. C. A., sec.* 371, in existence since 1917 which provides for leave of absence without loss of pay for District of Columbia employees when "ordered to duty with troops or at field exercises, or for instruction"; 39 *Stat.* 207 (1916), as amended 42 *Stat.* 1035 (1922), 32 *U. S. C. A., sec.* 65, in effect since 1922 (later amended 44 *Stat.* 674 (1926) and 61 *Stat.* 501 (1947), in other respects) which makes provision for National Guard members to attend and pursue a regular course of study at any military service school of the United States "* * * during a period of field training or other outdoor exercises"; *i. e.,* such personnel are given the privilege of attending service schools *while they are engaged in field training* (or other outdoor exercises) although the Congress clearly made a distinction between the two types of training; 39 *Stat.* 206 (1916), as amended 43 *Stat.* 363 (1924), 32 *U. S. C. A., sec.* 62, existing (as amended) since 1924, provided (in 1931—this enactment has also undergone subsequent amendments, 54 *Stat.* 1135 (1940), 61 *Stat.* 501 (1947) and 62 *Stat.* 90 (1948) in various particulars) for company, troop and other military or naval *unit* instruction, requiring participation in "encampments, maneuvers, or other exercises, including outdoor target practice, at least fifteen days in training each year," and 39 *Stat.* 206 (1916), 32 *U. S. C. A., sec.* 63, a portion of a 1916 act still in effect, related such encampments, maneuvers or other exercises to field or coast-defense instruction. Also 39 *Stat.* 207 (1916), 32 *U. S. C. A., sec.* 64, another portion of the above 1916 act, provided (and as amended in 1926, 44 *Stat.* 674, and 1947, 61 *Stat.* 501, still provides) for assemblages of officers and men of the National Guard for the purpose of attending service schools; 39 *Stat.* 207 (1916), 32 *U. S. C. A., sec.* 145 (as amended in 1926, 44 *Stat.* 674) provides that officers of the National Guard attending assemblages under section 64 shall be entitled to

pay and allowances, etc., "at the same rates as for encampments or maneuvers for field or coast-defense instruction." These references to state and federal legislation are not exhaustive. They serve, however, to illustrate the clear distinction, made in both realms of legislative effort between "field" training or instruction and other types of military or naval duty, service or instruction. There is no doubt that the Legislature of this State had this distinction in mind when *L.* 1931, *c.* 347, *secs.* 1, 2, now *R. S.* 38:23-1, was enacted and while we may not be certain as to the motivation of the Legislature in applying that distinction, it is probable that at least one consideration was that the organized units of the National Guard and other reserve forces are those primarily to be considered as necessary to the defense of the State, ready to fight on very short notice and *required* by law to undergo field training, *i. e.*, training for battle as a unit, without the consent of the individual serviceman to support or prepare for that defensive effort. The maintenance of the armed military units, trained and always prepared for immediate commitment to organized defensive battle directly (as infantry and mechanized combat units, including air squadrons and marine or naval battalions) or in support (such as artillery and anti-aircraft battalions and the like) is of great public importance. This may have been a reason for the legislative classification; it may also be that the Legislature concluded the *mandatory* payment of civilian compensation was not justified in cases where individuals could select active duty training for extended periods of time, that duty providing a less direct, though just as commendable, a public benefit to the State.

*Constitutionality of R. S.* 38:23-1:

▮ The defendant first contends that *R. S.* 38:23-1 is unconstitutional in that it constitutes a donation of public money to private individuals in violation of *N. J. Const.* 1844, *Art. I, par.* 19, or its counterpart, *N. J. Const.* 1947, *Art. VIII, Sec. III, par.* 2. The courts will incline to a construction

favoring the validity of a statute unless its invalidity plainly appears. *Everson v. Board of Education,* 133 *N. J. L.* 350 (*E. & A.* 1945).

■■ Was the statute in question enacted for a private or public purpose? That seems to be the proper test. The Government is calling for troops, and, in addition to voluntary individual action is drafting men to duty with the armed forces. National Guard, Army, Navy and Air Force organized reserve units, Marine Corps organized reserve battalions, and many individuals in the other reserve components of the armed forces have been called to active duty and many are now engaged in field operations. At the same time other National Guard, Army, Navy, Air Force and Marine Reserve units are being maintained and more are being activated in order to provide that support necessary to the defense of the nation. Such is our present situation. It did not exist in 1931 (as before noted, *R. S.* 38:23–1 was originally enacted as *L.* 1931, *c.* 347, *secs.* 1, 2) except in the intelligence and foresight of those in whose custody rested the welfare of the people. Its remoteness in that year rendered the need for trained, organized reserve military and naval forces no less important—and individuals were sought to fill the ranks of those units. It was a known fact that the organized reserves and militia (such as the National Guard) would be the first to leave their homes in an emergency. All alike, whether liable to military duty or not, were interested in the maintenance of the Government to support which armies are raised. The State of New Jersey, as an organized political community, was interested in supporting the Federal Government and strengthening its armies. It is sufficient for the court to say that the statute now under consideration was designed to provide for expenditures of money for the protection of the person, property and rights of the residents of the municipality as well as of every other citizen of the State. This was for a public purpose. *State, Ruckman v. Demarest, Collection of Harrington,* 32 *N. J. L.* 528, 540 (*E. & A.* 1866), writ of error declared abated by

death of the parties, 110 *U. S.* 400, 28 *L. Ed.* 191 (1884). Compare *City of Camden v. South Jersey Port Commission,* 4 *N. J.* 357, 367–369 (1951); *Everson v. Board of Education of Ewing Township,* 133 *N. J. L.* 350, 353, 355 (*E. & A.* 1945), affirmed 330 *U. S.* 1, 91 *L. Ed.* 711 (1947), reh. den. 330 *U. S.* 855, 91 *L. Ed.* 1297 (1947).

Next the defendant argues that the statute in question, now *R. S.* 38:23–1, is special legislation in contravention of *N. J. Const.* 1844, *Art. IV, Sec. VII, par.* 11, and its counterpart, *N. J. Const.* 1947, *Art. IV, Sec. VII, par.* 9, *clause* (13), in that it constitutes regulation of the internal affairs of municipalities. The law of this State is settled to the contrary. Where the statute in question as the one before us has general application to all municipalities, or to a properly classified group of municipalities, the regulation by the Legislature effected by that statute concerning the internal affairs of municipalities, including performance of duty by police officers, is constitutional. *Borough of Jamesburg v. Hubbs,* 6 *N. J.* 578, 584 (1951). The defendant's argument on this point includes the premise that the effect of the statute is to increase the compensation of all reserve officers in public (state or municipal) service who voluntarily return to active duty in the Army for training and therefore is special legislation because it relates only to reservists. We find no merit in this latter premise. As we have read the statute it applies to leave required for field training. It is general in its application and does not increase the pay of the reservist-employee. On the contrary, the enactment maintains the level of compensation paid by the state public body. The effect adverted to by the defendant is caused by additional pay received by the employee as a member of the armed services on active duty. As a practical matter the statute merely designates an instance in which the municipality shall grant leave of absence with pay, leaving other instances to the determination of the municipality under *R. S.* 40:46–32, which has application to all municipal employees, and *R. S.* 38:23–3, *supra,* which applies to reservists, or others

entering military service, when on duty with the armed forces of the nation for duty other than field training, and statutes of like effect (some of which are discussed *ante*).

The final constitutional attack on the statute made by the defendant is that the legislation is violative of *N. J. Const.* 1844, *Art. IV, Sec. VII, par.* 11, and *N. J. Const.* 1947, *Art. IV, Sec. VII, par.* 9, *clause* (8) because it is a grant of exclusive privilege to individuals. The defendant overlooks the fact that the constitutional inhibition is applicable only to special legislation and expressly permits general legislation. In *R. S.* 38:23–1 the "privilege" is granted to all state and municipal employees who as reservists enter upon active duty with their military or naval reserve units for field training. This classification is sufficiently broad to constitute general legislation. Defendant contends that the statute discriminates against reservists not in public service. This argument fails to consider the fact that the State is acting in its proprietary capacity as an employer. The defendant's argument in effect is that no right may be accorded a state or municipal employee that is not accorded an employee of a private citizen or corporation. Such a contention is entirely unsound and without merit.

*Subsidiary matters:*

The parties to the appeal raised various additional questions on this appeal. The question argued as to whether the plaintiff had waived the rights he asserted in this action under the circumstances surrounding this action, is without merit. The question whether the Constitution of 1844 or the Constitution of 1947 control the validity of the statute here involved is unnecessary to decide in view of the practical identity of the clauses of the 1844 charter invoked to those of the 1947 charter. The question as to the propriety of the incorporation of certain documents in the defendant's appendix is not decided for the reason that we have found it unnecessary to base our determination upon consideration of those documents.

For the reasons expressed in this opinion the judgment of the Superior Court, Appellate Division, is reversed and the judgment of the Bergen County District Court is reinstated and affirmed.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, BURLING and ACKERSON—6.

*For affirmance*—Justice WACHENFELD—1.